# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY, Plaintiff, | § § § § | |
| v. | § § | |
| OGLEBAY NORTON MINERALS, INC. and OGLEBAY NORTON COMPANY (n/k/a OGLEBAY NORTON COMPANY LLC), Defendants. | § § § § § § § | EP-17-CV-47-PRM |

## ORDER GRANTING MOTION
## FOR PARTIAL SUMMARY JUDGMENT

On this day, the Court considered Plaintiff Union Pacific Railroad Company's [hereinafter "UPRR"] "Motion for Partial Summary Judgment" (ECF No. 44) [hereinafter "Motion"] filed on January 16, 2018, Defendants Oglebay Norton Minerals, Inc. [hereinafter "ONMI"] and Oglebay Norton Company's [hereinafter "ONC"] "Response to Plaintiff's Motion for Partial Summary Judgment" (ECF No. 45) [hereinafter "Response"] filed on January 30, 2018, and UPRR's "Reply in Support of its Motion" (ECF No. 46), filed on February 6, 2018, in the above-captioned cause.

After due consideration, the Court concludes that ONC is a "potentially responsible person" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"),[1] and thus that UPRR's Motion should be granted.

## I. BACKGROUND

### A. History of the El Paso Site and the Slag

This dispute revolves around which parties are liable for environmental cleanup efforts at a metal processing facility located in El Paso, Texas. UPRR claims that ONC, ONMI's corporate parent, is liable due to its prior operation of the facility. ONC[2] denies such liability. It claims that while a few of its employees assisted with remediation efforts purely on behalf of ONMI, ONC was not involved in operating the facility. Thus, the Court must decide whether ONMI was independently operating the facility, or whether ONC is liable as an operator.

Before the Court makes this determination, some historical context is necessary. This dispute dates back to 1975, when a company

---

[1] Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 (West).

[2] Because this Motion seeks a determination only that ONC is liable pursuant to CERCLA, the Court will refer only to ONC instead of "Defendants" when discussing any response arguments to the Motion.

called "Parker Brothers" purchased copper "slag"[3] from the American Smelting and Refining Company ("ASARCO"), which operated a smelter in El Paso, Texas. Mot. Ex. 1, "Plaintiff's Proposed Undisputed Facts" ¶1 [hereinafter "UF"].[4] Parker Brothers stored its slag on a piece of property located adjacent to ASARCO's smelter, which property [hereinafter "the Site"] was owned by UPRR's predecessor, Southern Pacific. *Id.* at ¶2. When UPRR merged with Southern Pacific in 1997, UPRR became the owner of the Site, and assumed the lease agreement with Parker Brothers. *Id.* at ¶3.

On April 19, 1999, ONMI was incorporated in Delaware as a wholly-owned subsidiary of Norton Industrial Sands, Inc., which itself was a wholly-owned subsidiary of ONC. *Id.* at ¶4. ONMI was incorporated for the purpose of acquiring Parker Brothers' assets, including all of the slag material that was being stored at the Site. *Id.*

---

[3] "Slag" is defined as the scoria of metal, meaning the refuse from the melting of metals. *Slag*, Merriam-Webster Online Dictionary (2017).

[4] ONC responds directly to each of UPRR's proposed undisputed fact statements, admitting to many statements and contesting others. *See* Resp. Ex. 1. When the Court refers to ONC's "admitting" or "conceding" certain facts, or other similar phrases, ONC either explicitly agreed with or did not contest UPRR's description/characterization of those facts. To the extent ONC disagrees with UPRR's facts, the Court adopts ONC's accounting of events and draws all reasonable inferences in its favor.

at ¶¶4–7.  On April 20, 1999, ONMI purchased the slag material on the Site and took possession of it from Parker Brothers.  *Id.* at ¶7. Further, ONMI entered into a new agreement to lease the Site from UPRR for "the purpose of operating a plant for the processing of slag." *Id.* at ¶9.  ONMI had no other operations than those it conducted at the El Paso Site.  *Id.* at ¶11.

On December 11, 2001, ONMI received a Notice of Violation ("NOV") from the Texas Commission on Environmental Quality ("TCEQ")[5] that outlined two different environmental violations and demanded compliance within thirty days.  *Id.* at ¶16.  Specifically, the TCEQ took issue with the "unauthorized discharges of baghouse dust and undersize slag product" on the soil and unpaved surfaces at the Site, as well as those substances' storage in a "tote bag."[6]  Mot. Ex. 16 at Defs_2915.  Coincidentally, around the same time as the NOV, "Oglebay Norton closed the El Paso site as part of its 2001

_____

[5] For purposes of simplicity, the Court will refer to TCEQ in the Order, even though it was TCEQ's predecessor, the Texas Natural Resources Conservation Commission, that issued the NOV.

[6] Neither party has explained what exactly these substances are, or how exactly their presence at the Site violated environmental laws. Thus, the Court assumes a functional knowledge of these substances is unnecessary to deciding this Motion.

restructuring" on an undisclosed day in December of 2001. UF ¶13. Thus, ONMI ceased active operations at the Site, and immediately thereafter became insolvent. UF ¶14.

## B. Initial Cleanup Efforts

The course of events following ONMI's cessation of active operations at the Site comprises the heart of the current dispute. The parties paint a drastically different picture regarding which party, ONMI or ONC, controlled the post-2001 cleanup activities undertaken in an attempt to address the environmental violations alleged by TCEQ. This is because the party that "operated" the facility during the remediation efforts is liable under CERCLA for costs stemming from cleanup of that operation.

There is no dispute that in 2002, Steve Herron, the Manager of Technical Services and Regulatory Affairs for ONMI, applied to TCEQ's "Voluntary Cleanup Program" [hereinafter "the Program"]. The Program "provides administrative, technical, and legal incentives to encourage the cleanup of contaminated sites in Texas." Voluntary Cleanup Program, https://www.TCEQ.Texas.Gov (last visited Mar. 26, 2018). ONMI was accepted into the Program, and Herron appears to have initially been the lead contact between ONMI and TCEQ. *See*,

*e.g.*, Resp. Ex. 30 (letter from Herron to TCEQ); Resp. Ex. 33 (same). It is unclear how much cleanup of the Site was actually accomplished under Herron's supervision.

The evidence suggesting ONC's control of operations at the Site begins in 2005. In that year, Darlene Bray—ONC's Senior Environmental, Health, and Safety Manager—took over as "project manager" of the Site. UF ¶18. The reason for the switch from Herron, an ONMI employee, to Bray, an ONC employee, is unclear. Bray provided services to ONMI pursuant to ONC's "shared services" program with ONMI. Resp. 2. Pursuant to this arrangement (the contours of which are not clearly defined), ONC provided legal services, tax services, financial services, human resources, and, importantly, environmental services to ONMI and other subsidiaries. *See* Resp. Ex. 1, 7 (Excerpts of Daniel Rose and Rochelle Walk deposition transcripts). ONC's subsidiaries shared these services because it was not cost-effective for each subsidiary to pay for its own full-time employees in each of these fields. *See* Resp. Ex. 7, Walk Dep. 216:6–21. ONMI allegedly paid ONC for these services. Resp. 2. ONC claims its employees worked "on behalf of" ONMI pursuant to this shared services arrangement.

However, there is almost no evidence that ONMI was involved in remediation efforts on the Site after 2004 once Bray got involved. Bray was employed solely by ONC, never by any other ONC affiliate including ONMI. UF ¶19. She reported directly to ONC's Corporate Director of Environmental Health and Safety, Timothy Adkins. *Id.* Adkins appears to be the most senior Environmental Health & Safety officer at ONC, and reported to ONC's Board of Directors. In 2005, Adkins reported to the Board that because of the "high profile nature of the El Paso site," remediation was being "very closely monitored and managed by" Bray. Mot. Ex. 20. ONC does not contest that Bray made environmental, health, and safety recommendations for the Site, subject to approval only by Adkins, who had final decision-making authority over the Site. UF ¶21. UPRR lists numerous uncontested facts detailing both Bray and Adkins's involvement in remediating the Site and working with TCEQ to bring the Site into compliance. *See* UF ¶¶22–23.

In July 2005, TCEQ informed Bray, now the lead contact in the environmental cleanup effort at the Site, that the piles of slag on the Site constituted "solid waste" and required a response action. UF ¶25. In August 2005, Bray and Adkins retained Environmental Resources

Management ("ERM"), an environmental consulting firm. ERM responded to TCEQ that the slag had various beneficial purposes and that it was not waste. *Id.* at ¶26. After receiving this response, TCEQ changed its position and stated that "[i]f the slag at the site is being used in a beneficial manner as described in the response letter, it will not be considered waste. However, if it is not being used, is just stockpiled, or otherwise left at the site, it will be considered a solid waste[.]" UF ¶28. Because TCEQ did not require an immediate response action for the slag piles, Bray's sole focus became addressing the previous outstanding NOV rather than removing the slag.

To that end, Bray undertook various measures to bring the Site into compliance. Specifically, she worked with ERM to conduct various soil treatments that lowered the elevated lead content in the soil on the Site. *Id.* at ¶29. In March 2006, Bray submitted a request to TCEQ for a "no further action" letter, indicating that she believed there were no longer environmental violations on the Site. *Id.* In April 2006, TCEQ issued a no further action letter and removed the Site from TCEQ's Voluntary Cleanup Program. *Id.* at ¶30.

## C.  Efforts to Remove the Slag from the El Paso Site

Despite being in compliance with TCEQ's initial NOV, Bray continued environmental cleanup efforts and attempted to remove the remaining piles of slag from the Site. *Id.* at ¶31. As it had done with the previous cleanup, ONC paid for all of the efforts to remove the slag. *Id.* at ¶32. Bray, along with Adkins and other ONC employees, extensively contemplated how to remove the slag piles from the Site. According to Bray, there were three options for removing the slag, which she ranked in order of economic preference: sell the slag to a buyer, give the slag away, or pay to dispose of the slag. *Id.* at ¶36. While Bray and other ONC employees considered multiple buyers for the slag, *id.* at ¶37, the ONC Board of Directors was assured that the slag would be removed by the end of 2006, *see* Mot. Exs. 35–36. There is some evidence that Bray found a buyer and sold a small portion of the slag, but ONC claims there is no evidence to support that this sale took place. Resp Ex. 1 at 19. Regardless, on March 1, 2007 (very close to the expiration of ONMI's lease on the Site), Adkins reported to ONC's Board of Directors that efforts to sell or give away the slag had been unsuccessful, and he suggested that if they could not reach a deal with their "final potential customer[,]" "disposal at a significantly

9

higher cost is the only remaining option for removal." Mot. Ex. 39.

Shortly before Adkins's report to the Board, ONC employees discovered that UPRR had allegedly removed a "rail spur"[7] that serviced the leased Site. UF ¶41. UPRR admits that it removed the rail spur without consulting ONC or ONMI, but claims that ONMI's lease did not include use of the rail spur and that UPRR had a unilateral right to remove the spur. UF ¶41 n.5; *see also* Mot. Ex. 37 (email between UPRR employees suggesting an unrelated motive for removing the spur and indicating their belief that the spur belonged to UPRR). Viewing the evidence in a light most favorable to ONC, the removal of the rail spur seriously hindered Bray and others' ability to find a buyer for the slag. As Bray stated in a memo to ONC Vice President–Law Dan Rose (ONC's chief legal officer),[8] the rail spur had offered the most economical form of removing the slag. Mot. Ex. 40.

On May 10, 2007, Rose sent UPRR a letter declaring that UPRR's "unilateral action and interference [by removing the rail spur] with

[7] A rail spur is a "railroad track that branches off from a main line," *Rail Spur*, Merriam-Webster Online Dictionary (2017), which railroad operators use to allow the loading and unloading of railcars at a particular location without interfering with other railroad operations.

[8] Although he was ONC's chief legal officer, Rose claims that he also provided legal services to ONMI as part of their shared services model. *See* Resp. Ex. 11, Aff. of Daniel Rose.

[ONMI's] operations on the Premises" had "frustrated" ONMI's efforts to wind down operations at the Site. Mot. Ex. 41. Rose stated that despite UPRR's "interference with [ONMI]'s use of the premises," ONMI had continued to attempt to find a buyer for the slag but had been unsuccessful. *Id.* Rose then notified UPRR that ONMI thereby terminated the lease and surrendered possession of the Site "as is," with the piles of slag still present. *Id.* ONMI then vacated the Site.

UPRR responded to Rose's letter and disputed his claims about its interference with the property and ownership of the rail spur. UF ¶46. Neither Rose nor any other ONC or ONMI employee followed up or investigated UPRR's response. *Id.* at ¶46.

### D. UPRR's Disposal of the Slag

After receiving the letter allegedly terminating the lease agreement, UPRR came into possession of the Site, which included the slag piles. UPRR removed the slag piles and slag-containing materials from across the Site and disposed of them at a "Texas Custodial Trust Site." UF ¶52. ONC does not contest that some of the slag material was properly considered "solid waste" and contained hazardous

substances.[9] UF ¶50–51. UPRR claims that it has incurred over four million dollars in expenses to clean up the slag and remediate the Site. Mot. 1. Accordingly, it seeks reimbursement from ONC for its expenses pursuant to CERCLA and the Texas Solid Waste Disposal Act. *Id.*

## II.  LEGAL STANDARD

### A.  Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute will be found to exist "if the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*,

---

[9] ONC strenuously highlights differences between "subsurface" and "stockpile" slag in an attempt to limit its liability only to the stockpile slag. Resp. Ex. 1 at ¶¶69–70. Further, ONC discusses different categories of slag material that UPRR removed, some of which was considered hazardous and some of which was not. *Id.* at ¶¶50–51. However, these issues concern the scope of ONC's liability, not the threshold question of whether ONC is a potentially responsible person. Thus, these issues are outside the bounds of UPRR's Motion, which seeks a determination as to whether ONC is liable under CERCLA. The Court will allow the parties to explain these distinctions and argue their respective points at trial on the issue of damages.

477 U.S. 242, 248 (1986)). "A dispute 'is material if its resolution could affect the outcome of the action.'" *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 504 (S.D. Tex. 2015) (quoting *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005)).

"Under Federal Rule of Civil Procedure 56(c), the party moving for summary judgment bears the initial burden of . . . 'identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). When the moving party has met its initial burden, "the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). In adjudicating a motion for summary judgment, a court "consider[s] evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in favor of that party." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

## B. CERCLA Liability

CERCLA was enacted in 1980 as a broad, remedial response to environmental harm. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667 (5th Cir. 1989). The statute encourages a timely response to environmental hazards and ensures the "costs of such cleanup efforts [a]re borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). As such, courts agree that CERCLA should be construed liberally to effectively implement its goals. *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 242 (5th Cir. 1998); *Asarco LLC v. Cemex, Inc.*, 21 F. Supp. 3d 784, 800 (W.D. Tex. 2014) (citing *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir. 1992)).

Unfortunately, courts also agree that CERCLA, a hastily enacted legislative compromise, is poorly drafted, ambiguous, and difficult to interpret. *Amoco Oil*, 889 F.2d at 667 ("[B]ecause [CERCLA] was enacted as a 'last-minute compromise' between three competing bills, it has 'acquired a well-deserved notoriety for vaguely drafted provisions and an indefinite, if not contradictory, legislative history.'" (quoting

*United States v. Mottolo*, 605 F. Supp. 898, 902, 905 (D.N.H. 1985))).[10]

CERCLA imposes strict liability for environmental contamination upon four broad classes of potentially responsible parties:

(1) the owner and operator of a vessel or a facility,

(2) any person[11] who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ["owner" or "operator"],

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ["arranger"], and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment

---

[10] Other courts have called CERCLA a "legislative nightmare," *Rhodes v. County of Darlington, S.C.*, 833 F. Supp. 1163, 1190 n.18 (D.S.C. 1992), with a "legislative history [that] is unusually riddled by self-serving and contradictory statements," *United States v. Wade*, 577 F. Supp. 1326, 1331 (E.D. Penn. 1983). The Ninth Circuit suggested that CERCLA's "baffling language" might have been prevented had the court been present, along "with a red pen and a copy of Strunk & White's *Elements of Style*," at the time of the statute's drafting. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 883 (9th Cir. 2001).

[11] CERCLA defines "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21) (2006); *see also United States v. Bestfoods*, 524 U.S. 51, 56 (1998) (recognizing that the definition of "person" includes corporate entities).

facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

*Burlington*, 556 U.S. at 609–10 (quoting 42 U.S.C. § 9607(a)).

CERCLA further provides that those parties are specifically liable for

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a).

UPRR brings the current Motion solely for the purpose of determining whether ONC is an "operator" or "arranger" pursuant to CERCLA § 9607(a). To determine operator liability, the Court must determine whether ONC "operated" the El Paso Site "at the time of disposal of any hazardous substance." Because the Court concludes that ONC was an "operator" of the El Paso Site when the slag was

disposed of, which is sufficient to impose CERCLA liability on ONC, it declines to analyze whether ONC was also an arranger.

## C. Operator Liability

CERCLA imposes liability on both "owners" and "operators" of a polluting facility. A parent company may only be derivatively liable as an "owner" for the actions of a subsidiary when a plaintiff can pierce the subsidiary company's corporate veil pursuant to principles of corporate law. *United States v. Bestfoods*, 524 U.S. 51, 63–64 (1998). However, a plaintiff need not pierce the subsidiary's veil to hold a parent liable "for its own actions in *operating* a facility owned by its subsidiary." *Id.* at 64 (emphasis added). Thus, "derivative liability cases are to be distinguished from those in which 'the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management' and 'the parent is directly a participant in the wrong complained of"—i.e., the parent "operated" the facility. *Id.* (quoting Douglas & Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193 (1929)).

UPRR here seeks summary judgment on the question of whether ONC was an operator of the Site, but does not seek judgment on whether ONC was an owner of the Site. Mot. 5 ("The sole element of

UPRR's CERCLA claim before the Court is whether ONC is an "operator" and an "arranger."). Thus, the Court's inquiry is limited to ONC's interaction with the Site, and the Court need not analyze broader questions related to whether ONMI was a sufficiently independent/legitimate entity such that its parent corporations are shielded from liability.

"[U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Bestfoods*, 524 U.S. at 66. The statute "obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71. However, the term "operator" is limited in the sense that it refers to "operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* Thus, for an entity to be considered an operator under CERCLA, "there must be some nexus between that . . . entity's control and the hazardous waste contained in the facility." *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 520 (S.D. Tex. 2015)

(quoting *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 928 (5th Cir. 2000)).

The Supreme Court has suggested situations in which a parent company's control over the offending facility might suggest the parent's own CERCLA liability. On the one hand, operator liability usually attaches where the parent company operates "in the stead of its subsidiary or alongside its subsidiary in some sort of joint venture." *Bestfoods*, 524 U.S. at 71. Further, parent companies are liable as operators where "actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* at 72. On the other hand "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Id.* at 69. Further, it is never sufficient for liability that "dual officers and directors made policy decisions and supervised activities at the facility[.]" *Id.* at 69–70.

## III. ANALYSIS

Because determining operator liability depends so heavily on the facts of each case, it is difficult to draw concise analogies between this

case and other CERCLA operator cases within the Fifth Circuit and in other circuits. The *Bestfoods* opinion remains the clearest guiding doctrine in resolving this dispute. Thus, the Court relies mainly on that decision in the following analysis.

## A. Whether ONC was an Operator

To determine whether ONC was an operator of the Site, the Court must determine whether ONC "directed the [environmental] workings of," "managed," or "conducted the [environmental] affairs of" the Site. *Bestfoods*, 524 U.S. at 66. This occurs when a parent company "operates the facility in the stead of its subsidiary[.]" *Id.* at 71. Here, the summary judgment evidence adduced by UPRR and the dearth of relevant evidence produced by Defendants are sufficient to conclude that ONC was an operator of the El Paso Site.

There is clear, uncontested evidence that Darlene Bray and Timothy Adkins were the individuals mainly responsible for environmental decision-making and compliance from 2005 until the termination of the lease. After becoming the project manager for the TCEQ voluntary cleanup program in 2005, Bray worked closely with ERM (the environmental consulting firm) and TCEQ (the Texas regulatory body) and oversaw the treatment of soil at the Site to reduce

lead content and bring the Site into TCEQ compliance. Mot. Ex. 18, Bray Dep. 39:6–40:22. After that project, Bray spearheaded the effort to sell or give away the slag piles on the property. *Id.* at 90:6–10. Over the course of two years, Bray admits that she spent over sixty days at the Site working on remediation projects. *Id.* at 59:13–15. Adkins had final decision-making authority over all of Bray's activity during this period. Mot. Ex. 13, Adkins Dep. 74:24–75:10.

Bray and Adkins were exclusively ONC employees, and were never employed or paid by ONMI. Bray and Adkins made exhaustive efforts to bring the Site into compliance with TCEQ requirements, and then to sell or give away the slag. ONC has presented almost no evidence that ONMI employees, managers, or directors were involved in environmental decision-making for the bulk of these remediation efforts.[12] There is virtually no correspondence between Bray, Adkins, and any ONMI employees. There are no ONMI board-meeting minutes discussing environmental activities. There are no internal emails

---

[12] ONC has offered evidence that Steve Herron, ONMI's Technical Services and Regulatory Affairs Manager, was involved in early remediation efforts. *See* Resp. Exs. 5, 30, 35, 37, 38, 45. However, it provides no evidence that Herron was involved after 2005, and no evidence that Herron had oversight or authority over, or even worked alongside, Bray and Adkins.

between ONMI employees regarding environmental cleanup. There is no evidence that ONMI employees, managers, or directors took any action or made any decisions regarding soil contamination or attempts to sell the stockpiled slag after 2005. Instead, every piece of evidence produced indicates that Bray managed the vast majority of remediation activities, Adkins supervised Bray and had final decision-making authority, and both reported to ONC's Board of Directors with periodic updates about remediation. Thus, the Court concludes that ONC, not ONMI, managed, directed, and conducted the environmental cleanup activities at the Site.

Although the Court comfortably concludes that ONC has failed to raise a fact issue regarding its status as an operator, any doubts about this status are quelled by CERCLA's statutory purpose. Specifically, courts should construe CERCLA's "broad remedial" provisions to ensure that parties responsible for environmental damage bear the cost of remediation. *MEMC Pasadena, Inc. v. Goodgames Indus. Sols., LLC*, 143 F. Supp. 3d 570, 577 (S.D. Tex. 2015), *opinion modified on reconsideration*, No. 4:13-CV-599, 2015 WL 9259088 (S.D. Tex. Dec. 18, 2015) (citing *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 242 (5th Cir. 1998)). ONC's agents were the parties responsible for

ensuring environmental compliance at the Site. They attempted repeatedly to remove the slag from the property, but ultimately decided to remove none of it and walk away from the removal effort due largely to cost. UPRR, the lessor of the Site, was then forced to remove all of its lessee's hazardous waste and bear the full cost of that removal. Shifting at least some of the cleanup costs here from UPRR to ONC is consistent with CERCLA's purpose of ensuring that any responsible parties pay their share for cleanup efforts. Thus, the Court's conclusion that ONC is liable here is bolstered by the policy undergirding CERCLA.

ONC proffers two main theories for why it should not be considered an operator.[13] First, it claims that ONC employees acted solely "on behalf of, and for the benefit of, ONMI, rather than ONC[.]" Resp. 1. Second, it claims that a parent company is not an "operator" of a facility where the parent only becomes involved in the facility to take remedial action and address environmental concerns. *Id.* at 8. Adopting a much narrower view of the term "operator," ONC claims that an operator must be part of environmental decision-making

---

[13] ONC argues in the alternative that even if it is liable, its liability should be limited only to the stockpiled slag. Resp. 19. The Court will not pass on that question at the moment, as it relates more to damages than the issue at hand.

during the facility's active operation, as opposed to once it has ceased operations and the only ongoing concern is remediation. *Id.* For the following reasons, the Court rejects both of these arguments.

### 1. Whether ONC Employees Worked on Behalf of ONMI

ONC leans heavily on its shared services model to contest its own liability. ONC argues that "where an employee of the parent is providing services to the subsidiary, that employee is working on behalf of the subsidiary, not the parent." Resp. 6. Further, regardless of who actually pays the employee's salary, an employee of a parent company need only "purport" to "represent the subsidiary or act for the subsidiary's benefit" to be acting "on behalf of" the subsidiary. *Id.* at 5–6. Thus, by providing environmental services to ONMI and claiming to represent ONMI, ONC acted on behalf of ONMI pursuant to their shared services arrangement. *Id.*

This argument is based on a contorted reading of *Bestfoods*. *Bestfoods* did not indicate that corporate officers of a parent company can avoid CERCLA liability by working as self-proclaimed "representatives" of a subsidiary and purporting to work for its benefit. While that case did hold that there is a presumption that *dual* officers who work for both the parent and subsidiary are presumed to be

working on behalf of the subsidiary when making decisions for the subsidiary, that presumption does not apply here, where the entities claiming to work "on behalf" of the subsidiary are not employees thereof. Instead, *Bestfoods* specifically noted that where an entity is employed solely by the parent company, and not the subsidiary, the actions of that employee are "of necessity taken only on behalf of" the parent. *Bestfoods*, 524 U.S. at 72. The *Bestfoods* Court remanded the case to develop the factual record on the issue of whether "an agent" of the parent—"who played a conspicuous part in dealing with" environmental operations of the subsidiary—was sufficiently involved to confer liability on the parent company. *Id.* at 72–73.

Thus, in this case ONC needed to provide evidence that raised an issue of fact as to whether its own agents were working on behalf of ONMI rather than ONC itself. To do this, ONC provides the following evidence: (1) a letter written by a dual ONC/ONMI officer indicating that the officer believed that Timothy Adkins was an "authorized representative" of ONMI (Resp. Ex. 25); (2) correspondence from ERM indicating that it believed it was working for ONMI, not ONC (*see, eg.*, Resp. Exs. 27, 28, 34, 36); (3) correspondence between TCEQ and various entities indicating that TCEQ believed it was working with

ONMI, not ONC (*see, e.g.,* Resp. Exs. 5, 45, 46, 50); (4) correspondence from Adkins and Bray purporting to be ONMI representatives in communications with third parties[14] (*see, e.g.,* Exs. 41, 44, 55); and (5) submissions to TCEQ regarding environmental cleanup that came from ONMI, not ONC. *See* Resp. Ex. 1 at ¶¶61–65. The Court finds that this evidence does not raise a fact issue as to whether the ONC employees were working on behalf of ONMI.

Rudimentary principles of agency law guide the Court's conclusion. "At the core of agency is a 'fiduciary relation' arising from the 'consent by one person to another that the other shall act on his behalf and *subject to his control*[.]'" *Arguello v. Conoco, Inc.*, 207 F.3d 803, 807 (5th Cir. 2000) (quoting *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 392 (1982)) (emphasis added). Accordingly, claiming to be someone's agent and/or purporting to work on their behalf is not equivalent to actually establishing a principal-

---

[14] ONC points to only one document, a "proposed bill of sale" unaccompanied by any correspondence, for its assertion that Timothy Adkins "interacted with other third parties as a representative of ONMI." Resp Ex. 1 at 29. While it is unclear whether this evidence alone raises a fact issue as to whether Adkins held himself out as a representative of ONMI, this fact does not have a particularly strong bearing on whether Adkins actually worked on behalf of ONMI. Thus, the Court assumes without deciding that this evidence indicates that Adkins held himself out as an ONMI representative.

agent relationship. *See* Restatement (Third) Of Agency § 1.02 Cmt. A (2006) ("[H]ow the parties to any given relationship label it is not dispositive [in determining the nature of the relationship.]"). Indeed, "courts consistently emphasize that the most important factor [in determining an agency relationship] is the extent to which the alleged principal has a 'right of control' over the alleged agent[.]" *Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*, 643 F. Supp. 2d 883, 892 (S.D. Tex. 2008).

Here, ONC's claim to be acting "on behalf of" ONMI is missing a crucial element—evidence that ONMI had any control over ONC employees' decisions after 2005, or that ONC's officers had an obligation to work in ONMI's interest.[15] ONC provides no evidence that its employees had an obligation to follow ONMI direction, include ONMI employees in decision-making, request ONMI approval for decisions, or protect ONMI's interests as a fiduciary or otherwise. While there is extensive evidence that Adkins, Bray, and other ONC employees *claimed* to work for ONMI and that various third parties

---

[15] ONC claims that its employees *must* have been working in ONMI's interest because ONC was not benefitted by the cleanup effort. Resp. 7. This argument falls flat. ONC's alleged altruism is not equivalent to a fiduciary responsibility or some other arrangement that might serve as the basis for an agency relationship.

believed them, there is no evidence that they actually did work on ONMI's behalf.[16]

Further, ONC has provided no evidence of a legally enforceable agreement between ONMI and ONC demonstrating that ONC was working on ONMI's behalf. ONC's evidence of a "shared services model" does not suffice in this regard. ONC argues that while it paid for remediation expenses at the Site, those expenses were "allocated to ONMI." Resp. Ex. 1 at ¶32. Thus, ONC claims that ONMI was paying for ONC's services, and therefore that ONC's agents worked on behalf of ONMI. Resp. 2. However, ONC admits that these remediation expenses were merely "allocated" to ONMI using ONC's "shared treasury services." *Id.* ONC's expert explained that ONC would pay for the services out of its own coffers but allocate the debt on ONMI's balance sheet. Resp. Ex. 24 at 15–16. Thus, ONMI apparently had no autonomy to control the services it paid for. ONC fails to explain how its own decision to allocate remediation expenses to a non-operational, insolvent subsidiary indicates that its own employees worked on behalf

[16] No evidence suggests that ONC employees informed any ONMI officers, directors, or managers when ONC made the decision to terminate ONMI's lease and abandon the slag at the Site. That those ONC employees found it appropriate to take this action without so much as an email to an ONMI representative is indicative of the pervasive control that ONC retained over the Site.

of the subsidiary. By all accounts, it appears ONC functionally paid for the services itself and became a creditor to ONMI with no expectation to be paid back. In sum, the shared services model does not indicate that ONC employees were working for ONMI, or that ONMI had any control whatsoever over remediation operations.

The Court finds that ONC has not brought forth any compelling evidence that its employees were agents of ONMI, or that ONMI retained any authority to manage, direct, or implement environmental decisions at the Site at the time that the lease agreement with UPRR was terminated. This is sufficient for the Court to impose CERCLA operator liability upon ONC.[17]

### 2. Whether Remediation Constitutes Operation

Next, ONC argues that it never "operated" the Site because ONMI's operations ceased in 2001, and any activities that occurred on the premises were related solely to environmental cleanup. ONC claims that "cleaning up the property and attempting to remove

---

[17] Some courts have suggested that "CERCLA liability may attach to an agent acting within the scope of his agency responsibilities to the principal." *Mainline Contracting Corp. v. Chopra-Lee, Inc.*, 109 F. Supp. 2d 110, 121 (W.D.N.Y. 2000). Thus, even if ONC's employees were working on behalf of ONMI, it is not entirely clear that ONC could avoid derivative liability for the actions of those employees.

potentially hazardous substances" is not the type of "environmental operations decisions contemplated by *Bestfoods*[.]" Resp. 8. Significantly, ONC cites no cases to support this proposition, and relies mainly on a policy argument regarding why an opposite conclusion would discourage Good Samaritans from assisting with remediation.[18] *Id.* at 10.

However, the statutory language of CERCLA and the *Bestfoods* decision foreclose this argument. Neither of these sources of law indicate that former operator liability can only attach where the putative operator was involved with the facility while other operations besides remediation were still active. The statute simply requires that a putative former operator conduct activities sometime in the past and "at the time of disposal" of any hazardous substances. As discussed further *infra*, the "disposal" of the slag piles occurred when ONC

---

[18] ONC argues that remedial actions in general are exempt from CERCLA if they are consistent with the National Contingency Plan ("NCP"), a set of federal regulations setting forth guidelines and procedures for preparing for and responding to discharges of oil and releases of hazardous substances. Resp. 10 (citing 42 U.S.C. § 9607(d)(1)). Notwithstanding the fact that ONC has not explained how its actions were consistent with the NCP regulations, it fails to mention the "Savings Provision" in § 9607(d)(3). This Savings Provision specifically precludes owners and operators from utilizing the NCP defense. *Id.* Thus, ONC's argument fails.

ceased its attempts to sell them and abandoned them at the Site. Thus, ONC operated the facility in the past at the time of disposal, which satisfies the statute.

Further, a past operator must only "manage, direct, or conduct operations specifically *related to* pollution" such as "decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66–67 (emphasis added). This broad language undoubtedly encompasses an operator that makes decisions solely about remediation after a facility has ceased other operations.[19] *Cf. Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 381 (3d Cir. 2013) (rejecting a similar argument that a current operator should not be held liable because the operator "ha[d] only managed remedial activities on the site"). Thus, the fact that ONC had no involvement in ONMI's main operations from 1999–2001 is of no consequence.

---

[19] The Court makes no judgment about whether this reasoning could be extended to an innocent third party who is hired to conduct remediation activities. In such a situation, the third party would presumably form an agency relationship with the landowner and therefore be working on his or her behalf. Here, as explained previously, there is no agency relationship: ONC acted as the principal to its own agents, who directed remediation. Thus, the fact that ONC was not involved in processing the slag while ONMI was active does not absolve it of liability.

## B. Whether the Slag was a Hazardous Substance and Whether it was "Disposed of"

In order to determine that ONC is a potentially responsible person under CERCLA, the Court must also determine whether the slag was a "hazardous substance" and whether there was a "disposal" of the slag when ONC operated it. First, ONC does not contest that at least some of the slag removed from the Site contained material that satisfied the CERCLA definition of "hazardous substance." *See* Resp. Ex. 1 at 24 (" . . . [C]ertain material on the premises included hazardous substances[.]"). UPRR also provides evidence that supports this conclusion. *See* Mot. Ex. 46 (agreement between UPRR and a third party for disposal of the slag indicating that the slag would include hazardous substances). Thus, the Court concludes that the slag that UPRR ultimately removed from the Site contained some hazardous substances.

Second, UPRR argues that ONC's decision to leave the slag as it was and terminate the lease with UPRR constitutes "disposal" of the slag. UPRR alleges that ONC knew that "any unused slag would need to be removed from the Site or otherwise remediated" and still decided to "abandon" the material. Mot. 2–3. UPRR reasons that failing to take action to remediate or remove the slag when ONC had possession

or authority over it constitutes disposal of the slag at the Site. The Court agrees.

> "The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

*Joslyn Mfg. Co. v. Koppers Co.*, 40 F.3d 750, 761 (5th Cir. 1994). Some of the terms in this definition, such as "deposit" or "inject," imply that that an operator must take affirmative steps to alter the previous condition of or transport the hazardous substance. However, other terms, such as "leak" or "spill," imply that the *failure* to take action or exercise due care can constitute a disposal as well. *See id.* at 761–62. The definition of disposal does not explicitly refer to situations where an operator of leased property abandons hazardous material, leaving the lessor responsible for removing it.

Here, the Court has already held that ONC took extensive remedial action on the Site. This included efforts to sell the stockpiled slag. *See* Mot. Ex. 32 (email from Darlene Bray to ONC employees detailing her efforts to sell the slag). This strongly suggests that ONC had control of the slag and authority to remove it. When those efforts were unsuccessful, ONC left the slag (which did not belong to UPRR)

on the property and terminated ONMI's lease agreement.[20]  It is undisputed that both Bray and Adkins knew that if the slag were "stockpiled, or otherwise left at the [S]ite, it [would] be considered a solid waste." Mot. Ex. 23 (letter from TCEQ to Darlene Bray).  Under these facts, it seems clear that ONC "disposed of" the slag by abandoning it on the premises ONMI had leased from UPRR.  *See Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 847 (4th Cir. 1992) ("[W]e think there clearly was a disposal in 1962 when the [defendant] closed down the [facility] and abandoned the [waste].  At that point, the mineral spirits [which were not considered waste before the defendant abandoned the property] clearly became "waste," as they were abandoned and were apparently never again used.").  Thus, cognizant of the directive to construe CERCLA's provisions liberally to effectuate its goal of ensuring responsible parties pay for

---

[20] ONC spends a great deal of its Response explaining that it was unable to sell the slag because UPRR removed the rail spur that serviced the Site. *See, e.g.*, Resp. 16.  Once the slag could not be removed by rail, ONC argues that it was "economically unfeasible" to remove the slag from the property.  This argument has no bearing on whether or not there was a disposal or whether ONC is liable in general.  While this may be a relevant fact during the Court's determination of an appropriate damages award, it is largely a collateral matter for the purposes of determining liability.

environmental cleanup, the Court holds that ONC's actions constitute a disposal here.

## C. Texas Solid Waste Disposal Act ("SWDA") Liability

ONC admits that "UPRR's SWDA claim rises and falls with its CERCLA claim." Resp. 19. The Texas Supreme Court has characterized the SWDA as Texas's "counterpart" to CERCLA. *R.R. St. & Co. Inc. v. Pilgrim Enterprises, Inc.*, 166 S.W.3d 232, 238 (Tex. 2005). Like CERCLA, the SWDA imposes liability upon those who "operated a solid waste facility at the time of processing, storage, or disposal of any solid waste[.]" Tex. Health & Safety Code Ann. § 361.271 (West). The Court holds that the SWDA operator liability provision is, at a minimum, coextensive with CERCLA's operator provision.[21] Thus, for the reasons previously discussed, ONC is additionally liable under SWDA as an operator. *See Zumwalt v. City of San Antonio*, No. 03-11-00301-CV, 2012 WL 1810962, at *6 (Tex. App.—Austin May 17, 2012, no pet.) (mem. op.) (The court "assum[es] without deciding that the scope of operator liability under the TSWDA is essentially coextensive with operator liability under CERCLA"); *MEMC Pasadena, Inc. v. Goodgames Indus. Sols., LLC*, 143 F. Supp. 3d 570, 582 (S.D. Tex.

---

[21] The Court makes no determination about whether SWDA liability is actually broader than CERCLA liability, as UPRR argues.

2015) ("[B]ecause the Court has found that GIS is liable under CERCLA as an arranger, the Court likewise finds that GIS is liable under the TSWDA."), *opinion modified on reconsideration*, No. 4:13-CV-599, 2015 WL 9259088 (S.D. Tex. Dec. 18, 2015).

## IV. CONCLUSION

Based on the foregoing, the Court concludes that UPRR has shown that there are no issues of material fact concerning ONC's liability for cleanup costs as a prior operator pursuant to CERCLA and the Texas SWDA. Thus, the Court is of the opinion that UPRR's Motion should be granted.

Accordingly, **IT IS ORDERED** that Plaintiff Union Pacific Railroad Company's "Motion for Partial Summary Judgment" (ECF No. 44) is **GRANTED**.

SIGNED this _8th_ day of **April, 2018.**

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE